JIM'S AUTO BODY *v.* COMMISSIONER
OF MOTOR VEHICLES
(SC 17758)

Rogers, C. J., and Norcott, Palmer, Zarella and Schaller, Js.

Argued October 26, 2007—officially released March 11, 2008

*Sebastian S. Ciarcia*, with whom was *Scott T. Rogalski*, for the appellant (plaintiff).

*Gregory T. D'Auria*, associate attorney general, with whom were *Drew S. Graham*, assistant attorney general, and, on the brief, *Richard Blumenthal*, attorney general, for the appellee (defendant).

*Alan Neigher* and *Sheryle S. Levine* filed a brief for the Auto Body Association of Connecticut as amicus curiae.

*Opinion*

NORCOTT, J. The principal issue in this appeal is whether an insurance company that is obligated to pay for the repair of a motor vehicle is a "customer" under General Statutes § 14-63 (b),[1] thereby allowing it to file a complaint with the department of motor vehicles (department) against a motor vehicle repair shop. The plaintiff, Jim's Auto Body, a sole proprietorship in Southington, appeals[2] from the judgment of the trial court dismissing its administrative appeal from the decision of the defendant, the commissioner of the department, wherein the department concluded that the

---

[1] General Statutes § 14-63 (b) provides in relevant part: "The Commissioner of Motor Vehicles shall adopt regulations, in accordance with the provisions of chapter 54, establishing (1) a procedure whereby *customers of dealers and repairers* may file complaints with the Department of Motor Vehicles concerning the operations of and services provided by any such licensees . . . ." (Emphasis added.)

[2] The plaintiff appealed from the judgment of the trial court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

American Express Property Casualty Company (AMEX) was a customer of the plaintiff pursuant to § 14-63, and that the plaintiff had violated General Statutes §§ 14-65g (a),[3] 14-65i (b)[4] and 14-65j (a).[5] We conclude that AMEX was a customer entitled to file a complaint under § 14-63, and that the remainder of the department's decision was supported by substantial evidence. Accordingly, we affirm the judgment of the trial court.

The record reveals the following relevant facts and procedural history. On June 9, 2003, a 1999 Toyota Avalon XLS (vehicle), owned by Byron Speckmann and insured by AMEX, was damaged in an accident. Speckmann chose the plaintiff to repair the vehicle, and on June 9, 2003, the plaintiff issued a "visible damage quotation" estimating the repair costs to be $13,572.63. Speckmann brought the vehicle to the plaintiff for repair on June 17, 2003, and, on that date, signed a "motor vehicle repair estimate/waiver" that was drafted by the plaintiff and contained both a "waiver of advance estimate" (waiver) and an "authorization of additional

[3] General Statutes § 14-65g (a) provides: "A customer may waive his right to the estimate of the costs of parts and labor required by section 14-65f, only in writing in accordance with this section. Such a waiver shall include an authorization to perform reasonable and necessary repairs to remedy the problems complained of, at a cost not to exceed a fixed dollar amount. The waiver shall be signed by the customer and the customer shall be given a fully completed copy of the waiver at the time it is signed. No repair shop shall use waivers to evade its duties under sections 14-65e to 14-65j, inclusive."

[4] General Statutes § 14-65i (b) provides: "Each motor vehicle repair shop shall post a sign, as required by this subsection, in each area of its premises where work orders are placed by customers. The sign shall state: (1) The hourly charge for labor; (2) the conditions, if any, under which the shop may impose charges for storage, and the amount of any such charges; and (3) the charge, if any, for a diagnosis."

[5] General Statutes § 14-65j (a) provides: "No repair shop shall make any statement to a customer which it knows or should know to be false or misleading. Such statements include, but are not limited to, statements as to the necessity of repairs, the condition of the customer's vehicle, and whether particular repairs have been performed by the shop."

repairs" (authorization). The waiver permitted the plaintiff to work on the vehicle without providing an advance estimate of repair costs, and authorized "reasonable and necessary cost[s] to remedy the problems complained of up to a maximum of $8,000."[6] In contrast, the authorization allowed the plaintiff to negotiate directly with AMEX for more money "if additional damage beyond the waiver estimate [was] discovered and related to the problem complained of . . . ."[7]

On June 20, 2003, AMEX appraised the vehicle through its agent, Complete Appraisal Service, LLC (Complete), which estimated the cost of the repairs to be $3954.21. The plaintiff and AMEX subsequently failed to reach an agreement about the necessary cost of repairs. On June 27, 2003, the plaintiff sent AMEX a "Notice of Temporary Termination of Repairs," and halted repair of the vehicle, without Speckmann's consent, due to numerous unsuccessful attempts to contact Complete for a supplemental appraisal.

Thereafter, Complete issued a supplemental appraisal of the vehicle on July 1, 2003, which estimated the cost of repairs to be $7929.48.[8] On July 28, 2003, the

---

[6] The waiver provides: "I voluntarily request that repairs be performed on my vehicle without an advance estimate of their cost. By signing [this] form, I authorize reasonable and necessary cost to remedy the problems complained of up to a maximum of $8,000. The repair shop may not exceed this amount without my written or oral consent."

[7] The authorization provides: "If additional damage beyond the waiver estimate is discovered and related to the problem complained of, I voluntarily request [the plaintiff] to negotiate with AMEX in my behalf for additional money. I consent to [the plaintiff] to exceed the waiver estimated cost."

The following language, highlighted in bold font in the original text, also is contained on the "motor vehicle repair estimate/waiver" after the authorization: "Your car is being repaired for you! It is your responsibility to obtain the checks plus your deduct[i]ble. We will not release your car before receiving full payment. This is not a reflection on your credit, but is necessary due to difficulty we have had *in securing payment from insurance companies*." (Emphasis added.)

[8] The plaintiff claims that it did not receive the supplemental appraisal until July 7, 2007.

plaintiff sent AMEX a "Notice of Deficiency in Insurance Estimate," outlining alleged deficiencies in Complete's supplemental appraisal and requesting a further supplement from AMEX. On July 29, 2003, AMEX informed the plaintiff that it deemed the vehicle a total loss,[9] and requested that it halt all repairs on the vehicle.

On July 31, 2003, the plaintiff provided AMEX with a document entitled "Work Bay/Outside Storage Options," which indicated that it had halted all repairs to the vehicle, and outlined storage options and fees pending retrieval of the vehicle.[10] On August 1, 2003, AMEX requested that the plaintiff store the vehicle outside, at a rate of $24 per day. The plaintiff released the vehicle to AMEX's agent, Copart Salvage Auto Auctions (Copart), on August 7, 2003, after Copart had tendered payment to the plaintiff in the amount of $8449.47. The payment to the plaintiff also was accompanied by a letter from AMEX, which indicated that the payment was being made under protest.

The plaintiff generated two invoices, both dated August 7, 2003, outlining the charges to AMEX concerning the vehicle. One invoice detailed the total cost of parts and labor for repairs that had been done to the vehicle, in the amount of $2697.85.[11] The second invoice outlined additional charges, not involving the physical repair of the vehicle, in the amount of $5315.86. The plaintiff, therefore, charged AMEX a total of $8013.71 for work performed on, and relating to, the vehicle.

[9] On July 31, 2003, Speckmann assigned the vehicle's title to AMEX and authorized the plaintiff to release the vehicle.

[10] The document provided that AMEX could either store the vehicle: (1) in the plaintiff's work bay, at a rate of $20 per hour or $160 per day; or (2) outside the plaintiff's facilities, at a rate of $24 per day.

[11] The charge of $2697.85 reflects a credit of $435.76 for the return of new parts (credit). The credit was not reflected in the amount tendered by Copart to obtain the vehicle from the plaintiff, namely, $8449.47. Accordingly, the total amount AMEX was actually charged, minus the credit, was $8013.71.

On November 24, 2003, AMEX filed a complaint with the department, claiming that the plaintiff had: (1) overcharged for repairs; (2) failed to obtain an authorization to perform repairs on the vehicle; (3) overcharged for towing and storage; and (4) refused to provide an invoice in which all charges were accounted for. The complaint resulted in an investigation by the dealers and repair division of the department. In the complaint investigation report (report), dated August 31, 2004, the department investigator referenced § 14-65g (a), and wrote that the department "is questioning the charges that are not related to remedy the problems complained of." The report specifically focused on the plaintiff's invoice for additional charges.[12] Based upon the findings of the report, an administrative hearing was recommended, pursuant to §§ 14-65g (a) and 14-65j (a), "to address the charges that were not related to remedy the problems complained of."

On February 10, 2005, the department sent the plaintiff's attorney a notice[13] summoning the plaintiff to appear at a department hearing on February 24, 2005. In the notice, the department alleged that the plaintiff violated: (1) § 14-65g (a), by charging for items not necessary to repair the vehicle; and (2) § 14-65j (a), by

---

[12] The report also described three signs posted at the plaintiff's facility, on which various services and the respective charges for each were listed. The first sign listed the rates for labor ($78 per hour), estimates ($78 per hour), inside storage ($33 per day for the first five days, $39 per day after five days), and outside storage ($20 per day for the first five days, $24 per day after five days). The second sign listed rates for outside storage that was fenced, lighted, and protected ($50 per day), and for bay tie-up ($120 per day, $20 per hour). The last sign provided for various administrative charges, and listed rates for a general administrative charge ($55 and up), an appointment fee ($68 per hour), professional service ($68 per hour), bay tie-up ($20 per hour), copies ($2), and facsimiles ($2 per page for incoming, $1 per page for outgoing).

[13] Although the notice was addressed to the plaintiff's attorney, the department also sent a copy of the notice directly to the plaintiff on February 10, 2005.

making a false statement with regard to the posted rate for bay tie-up charges, namely, that a sign posted in the plaintiff's facility listed a bay tie-up charge as $120 per day, when, in fact, it actually charged $160 per day.

At the department hearing held on February 24, 2005, the plaintiff argued, as a preliminary jurisdictional matter, that an insurance company should be precluded from filing a complaint as a customer, under § 14-63 (b), when the licensee's actions giving rise to the complaint concern a vehicle that the insurance company does not own. Specifically, the plaintiff argued that, in such a circumstance, an insurance company should not be considered a customer under § 14-63, because absent ownership of the vehicle, there is no contract between the licensee and the insurance company and, therefore, no consumer relationship. The attorney representing the department indicated that insurance companies previously have filed complaints with the department under § 14-63, and that the department has heard matters arising from those complaints. The department attorney further asserted that, in the present matter, it was the department's contention that AMEX was permitted to file a complaint under § 14-63 as a customer.

On March 17, 2005, the department's hearing officer issued a written decision outlining her findings of fact and conclusions of law. The hearing officer determined that "a written contract is not required for one to be a customer" under General Statutes § 14-64,[14] and that AMEX was, in fact, a customer. Regarding the alleged

[14] Although the department cites § 14-64 as the relevant statute under which the term "customer" is contemplated for purposes of this appeal, it is actually § 14-63 (b) that provides the right for a customer of a licensee to file a complaint with the department. Accordingly, we construe the term "customer" as contemplated under § 14-63 (b), not § 14-64, as § 14-64 concerns the department's power to suspend and revoke licenses, impose civil penalties and order restitution to any aggrieved customer, none of which are at issue in this appeal.

substantive violations, the hearing officer concluded that the plaintiff had violated § 14-65g because "it charged for items that were not necessary or reasonable to repair the problems complained of, as contemplated by the waiver of advanced estimate." The hearing officer also determined that the plaintiff had violated § 14-65i because "some of the charges on the invoice are not contemplated on any sign that is posted on the premises, and there are no criteria for the imposition of bay tie-up charges as opposed to storage charges . . . ." The hearing officer further concluded that the plaintiff had violated § 14-65j because "it misstated in writing and charged more for bay tie up charges than the amount posted on its sign on the premises." The hearing officer ordered: (1) suspension of the plaintiff's license for one week; (2) payment of a $1000 civil penalty, or $500 for each violation;[15] (3) filing a $1000 forfeiture bond with the department; and (4) payment of restitution to AMEX in the amount of $5145.86.[16]

The plaintiff appealed from the decision of the department to the trial court, claiming that the hearing officer improperly concluded that AMEX was a customer under § 14-63, and that the plaintiff had violated §§ 14-65g, 14-65i and 14-65j. Specifically, the plaintiff argued that AMEX cannot be a customer because it had no privity of contract with the plaintiff, and that the department's determination with regard to the substantive violations was not supported by the evidence.

The trial court concluded that "an insurance company that pays for, or arranges for, services provided to an insured or claimant by a licensee is a customer permit-

---

[15] Although the hearing officer concluded that the plaintiff had violated three statutory provisions, namely, §§ 14-65g, 14-65i and 14-65j, the plaintiff was ordered to pay a civil penalty for only two violations.

[16] The hearing officer concluded that AMEX was "responsible for parts and labor of $2697.85, an estimate charge of $78.00, and storage charges of $92.00."

ted to file a complaint under § 14-63," and that the department did not violate any law or exceed its statutory authority in deciding that AMEX was a customer for purposes of § 14-63.[17] The trial court further concluded that there was substantial evidence in the record to support the department's determination that the plaintiff had violated §§ 14-65g, 14-65i and 14-65j. Accordingly, the trial court rendered judgment dismissing the appeal. This appeal followed. Additional facts will be set forth as necessary.

On appeal, the plaintiff renews substantially the same claims that the trial court had rejected, namely, that the trial court improperly concluded that: (1) the department's determination that AMEX was a customer under § 14-63 was permissible; and (2) substantial evidence existed in the record to justify the department's conclusions that the plaintiff had violated §§ 14-65g, 14-65i and 14-65j. We address each claim in turn.

As a preliminary matter, we set forth the appropriate standard of review. "[J]udicial review of the commissioner's action is governed by the Uniform Administrative Procedure Act [(UAPA), General Statutes §§ 4-166 through 4-189], and the scope of that review is very restricted. . . . [R]eview of an administrative agency decision requires a court to determine whether there is substantial evidence in the administrative record to support the agency's findings of basic fact and whether the conclusions drawn from those facts are reasonable. . . . Neither this court nor the trial court may retry the case or substitute its own judgment for that of the

[17] In support of its conclusion, the trial court: (1) examined the dictionary definition of "customer"; (2) found that the plaintiff's "own estimate/waiver document acknowledges that AMEX and other insurance companies were customers of" the plaintiff; and (3) determined that limiting the definition of "customer" to owners of vehicles, under § 14-63, would lead to an absurd result, namely, that permitted users of vehicles would be unable to file a complaint.

administrative agency on the weight of the evidence or questions of fact. . . . Our ultimate duty is to determine, in view of all of the evidence, whether the agency, in issuing its order, acted unreasonably, arbitrarily, illegally or in abuse of its discretion." (Internal quotation marks omitted.) *Sengchanthong* v. *Commissioner of Motor Vehicles*, 281 Conn. 604, 609, 917 A.2d 942 (2007).

"A reviewing court, however, is not required to defer to an improper application of the law. . . . It is the function of the courts to expound and apply governing principles of law. . . . We previously have recognized that the construction and interpretation of a statute is a question of law for the courts, where the administrative decision is not entitled to special deference . . . . Questions of law [invoke] a broader standard of review than is ordinarily involved in deciding whether, in light of the evidence, the agency has acted unreasonably, arbitrarily, illegally or in abuse of its discretion. . . . Because this case forces us to examine a question of law, namely, [statutory] construction and interpretation . . . our review is de novo. . . . We are also compelled to conduct a de novo review because the issue of statutory construction before this court has not yet been subjected to judicial scrutiny." (Citation omitted; internal quotation marks omitted.) *Southern New England Telephone Co.* v. *Cashman*, 283 Conn. 644, 649–50, 931 A.2d 142 (2007).

I

The plaintiff's first claim on appeal is that the trial court improperly concluded that AMEX was a customer under § 14-63. The plaintiff asserts that, although the legislative history of § 14-63 is not dispositive about who constitutes a customer under the statute, a review of General Statutes §§ 14-65a through 14-65k demonstrates that a customer is a person who has privity of contract with a repair shop. The plaintiff further asserts

that, according to the term's common usage,[18] involvement in a " 'business dealing' " is a prerequisite to being a " 'customer,' " and claims that an insurance company cannot be a customer under § 14-63 unless its business dealings with a dealer or repairer constitute the " 'business of insurance,' " as contemplated by the United States Supreme Court in *Group Life & Health Ins. Co.* v. *Royal Drug Co.*, 440 U.S. 205, 99 S. Ct. 1067, 59 L. Ed. 2d 261 (1979).[19] In addition, the plaintiff proffers a three part test it asserts we should utilize in determining whether one is a customer under § 14-63, and it further argues that AMEX failed to meet the elements of the proposed test.

In response, the defendant claims that the text of § 14-63 and its relationship to other statutes demonstrates that "an insurance company that purchases services from a repairer licensee and falls victim to activities prohibited by the dealer/repairer statutes is a 'customer' entitled to file a complaint with the [department] . . . ." Although the defendant agrees that the term "customer" is not defined by the relevant statutes and department regulations, it argues that, based on common usage of the term "customer,"[20] a "rational

[18] In determining the common usage of the term "customer," the plaintiff relies on the following definition of "customer" provided in Black's Law Dictionary (6th Ed. 1990): "One who regularly or repeatedly makes purchases of, or has business dealings with, a tradesman or business. . . . Ordinarily, one who has repeated business dealings with another. A buyer, purchaser, consumer or patron." (Citations omitted.)

[19] In *Royal Drug Co.*, the United States Supreme Court "identified three criteria relevant in determining whether a particular practice is part of the 'business of insurance' *exempted from the antitrust laws* by § 2 (b) [of the McCarran-Ferguson Act]: first, whether the practice has the effect of transferring or spreading a policyholder's risk; second, whether the practice is an integral part of the policy relationship between the insurer and the insured; and third, whether the practice is limited to entities within the insurance industry." (Emphasis added.) *Union Labor Life Ins. Co.* v. *Pireno*, 458 U.S. 119, 129, 102 S. Ct. 3002, 73 L. Ed. 2d 647 (1982).

[20] The defendant notes in its brief that Merriam-Webster's Collegiate Dictionary (10th Ed. 1993) defines "customer" as "one that purchases a commodity or service . . . ." The defendant also cites the same definition of

reading of the word 'customer' in § 14-63 includes any person that purchases a service from a licensed dealer or repairer."[21] The defendant also contends that "[t]here is no explicit limitation in either . . . § 14-63 or . . . § 14-63-65 [of the Regulations of Connecticut State Agencies] that the term 'customers' or 'complainants' excludes insurance companies or only includes owners of motor vehicles."

The defendant further asserts that construing AMEX to be a customer under § 14-63 is consistent with the purpose of the statute, namely, "to expose wrongdoing by dealer and repairer licensees and to authorize the [department] to punish and correct such wrongdoing with administrative penalties, including restitution." In addition, the defendant claims that "[i]t would be irrational for the [department] to withhold restitution to a person who actually paid an improper amount for services rendered to a vehicle for lack of ownership because that is precisely the person who has the incentive to file a complaint and expose wrongdoing in the first place." The defendant also contends that, since § 14-65k gives the department the unilateral authority to investigate "any matter under the provisions of sections 14-51 to 14-65j, inclusive," the department "may also take action against any offending licensee based on a complaint filed by an insurance company or any other non-owner of a motor vehicle." We agree with the defendant that the trial court properly concluded that AMEX was a customer under § 14-63.

"The principles that govern statutory construction are well established. When construing a statute, [o]ur fundamental objective is to ascertain and give effect to

customer as does the plaintiff, namely, from Black's Law Dictionary (6th Ed. 1990). See footnote 18 of this opinion.

[21] In making this assertion, the defendant uses the term "person" as defined by General Statutes § 14-1 (65), which provides that any corporation or company is a person.

the apparent intent of the legislature. . . . In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of [the] case, including the question of whether the language actually does apply. . . . In seeking to determine that meaning, General Statutes § 1-2z directs us first to consider the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered. . . . When a statute is not plain and unambiguous, we also look for interpretive guidance to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter . . . ." (Internal quotation marks omitted.) *Southern New England Telephone Co.* v. *Cashman,* supra, 283 Conn. 650–51. "The test to determine ambiguity is whether the statute, when read in context, is susceptible to more than one reasonable interpretation." (Internal quotation marks omitted.) *Alexson* v. *Foss,* 276 Conn. 599, 605, 887 A.2d 872 (2006).

We begin by examining the language of the statute. Section 14-63 (b) provides in relevant part: "The Commissioner of Motor Vehicles shall adopt regulations, in accordance with the provisions of chapter 54, establishing (1) a procedure whereby *customers of dealers and repairers* may file complaints with the Department of Motor Vehicles concerning the operations of and services provided by any such licensees . . . ."[22] (Empha-

---

[22] Section 14-63-45 of the Regulations of Connecticut State Agencies, the regulation promulgated by the department outlining the procedure for customers of dealers and repairers to file complaints under § 14-63, provides: "All complaints filed with the Department of Motor Vehicles concerning motor vehicle dealers or repairers licensed pursuant to section 14-52 of the general statutes shall be made on a form prescribed by the commissioner.

sis added.) As the term "customer" is not defined in the statute, General Statutes § 1-1 (a) requires that we construe the term "in accordance with 'the commonly approved usage of the language.' " *Pasquariello* v. *Stop & Shop Cos.*, 281 Conn. 656, 665, 916 A.2d 803 (2007). "If a statute or regulation does not sufficiently define a term, it is appropriate to look to the common understanding of the term as expressed in a dictionary." (Internal quotation marks omitted.) *Southern New England Telephone Co.* v. *Cashman*, supra, 283 Conn. 656. "Customer" is defined with substantial similarity in a variety of popular dictionaries, each providing that the fundamental characteristic of a customer is the purchase of a service or commodity from another.[23] Neither the dictionary definitions nor the text of § 14-

---

The form will include, but not be limited to, the following information which must be answered by the complainant to the extent that he or she is aware of such information: (1) Name of complainant, (2) Address of complainant, (3) Name of licensee against whom the complaint is being made, (4) Address of licensee against whom the complaint is being made, (5) Year of motor vehicle, (6) Make of motor vehicle, (7) Identification number of motor vehicle, (8) Description of work or service performed or which was to be performed, (9) When work was done or to be done including time period motor vehicle was in the custody of the licensee, (10) Reason for complaint. If the complaint concerns repairs to a motor vehicle questions (11) and (12) as follows should be answered: (11) Was a written repair estimate made available to the complainant prior to the work being done on the motor vehicle, (12) Were any parts which were replaced returned to the complainant."

[23] See, e.g., American Heritage Dictionary of the English Language (4th Ed. 2004) (customer is "[o]ne that buys goods or services" as well as "[a]n individual with whom one must deal"); Merriam-Webster's Collegiate Dictionary (10th Ed. 1993) (customer is "one that purchases a commodity or service"); Black's Law Dictionary (6th Ed. 1990) (A customer is "[o]ne who regularly or repeatedly makes purchases of, or has business dealings with, a tradesman or business. Ordinarily, one who has repeated business dealings with another. A buyer, purchaser, consumer or patron."); Ballentine's Law Dictionary (3d Ed. 1969) (A customer is, "[i]n common usage, a person who buys the merchandise or engages the services of another person. In some contexts, the term has the more extensive connotation of a person who comes to the place of business of another for any purpose of concern to the latter.").

63, however, provide definitive guidance as to the legislature's intended breadth of the term "customer," namely, whether insurance companies may constitute customers for purposes of filing a complaint under § 14-63. Accordingly, we now examine the related statutes to ascertain whether they provide assistance in our construction of the term. See General Statutes § 1-2z.

General Statutes §§ 14-65f through 14-65j, all of which relate to the repair of motor vehicles, each use the term "customer." Relying on three of those statutes—specifically, General Statutes §§ 14-65f, 14-65g and 14-65h—the plaintiff claims that, under the facts of this case, AMEX is not a customer because it did not have privity of contract with the plaintiff. The plaintiff argues, rather, that since Speckmann, the vehicle's owner, was the only person listed on the repair contract, only Speckmann had privity of contract with the plaintiff, and, therefore, only Speckmann qualified as a customer under § 14-63. In response, the defendant claims that *anyone* who pays for a licensee's services should be considered a customer under §§ 14-63 through 14-65k, and contends that this is particularly true for insurance companies when, as in this case, the owner of the vehicle authorized the insurance company to pay for all repairs, thereby giving the insurance company a direct pecuniary interest in ensuring that the licensee follows the relevant statutory provisions. We find both parties' interpretations to be reasonable, thereby demonstrating the ambiguity of the term "customer" under § 14-63, and we are, therefore, permitted to consider extratextual sources in construing it. See General Statutes § 1-2z; *Alexson* v. *Foss*, supra, 276 Conn. 605.

With respect to extratextual sources, the legislative history of § 14-63 (b), which was enacted in 1986 as Public Acts 1986, No. 86-114, does not provide a definitive indication of the intended scope of the term "customer." Similarly, the legislative history for §§ 14-65f

through 14-65j provides no meaningful guidance about the intended breadth of the term "customer," as used in those sections and § 14-63 (b). What the legislative history does show, however, is that the purpose of §§ 14-63 through 14-65k is to regulate the industry of dealers and repairers, while simultaneously protecting customers of those licensees from unscrupulous business practices.

The legislative history concerning the enactment of §§ 14-65f, 14-65h and 14-65i, for example, which were enacted in 1975 as Public Acts 1975, No. 75-550, shows that the legislature's concern was regulating the automobile repair industry, protecting consumers, and reducing the overall number of complaints filed with the department. Speaking before the House of Representatives, Representative Robert J. Vicino remarked: "[T]his bill is a first in an effort to try to resolve some of the problems that now exist in the area of automobile repairs." 18 H.R. Proc., Pt. 9, 1975 Sess., p. 4231. In addition, Representative Vicino commented that the bill "will go a long way toward probably reducing complaints in the [d]epartment; that most people will know after they deal or before they deal with their repairer as to where they stand"; 18 H.R. Proc., Pt. 10, 1975 Sess., p. 4568; while Representative Abraham Glassman characterized it as "a good consumer [b]ill . . . ." Id., p. 4569. Senator Anthony M. Ciarlone remarked that "we are trying to tighten up an industry here and eliminate some problems"; 18 S. Proc., Pt. 7, 1975 Sess., p. 3351; and Senator Joseph J. Fauliso stated that "what we are trying to establish here is some integrity in the relationship between the repairer and the customer." Id., p. 3353.[24] This history demonstrates that §§ 14-63

---

[24] The legislative history concerning Senate Bill No. 265, which was later enacted, in part, in 1980 as Public Acts 1980, No. 80-425—and which, in turn, enacted General Statutes §§ 14-65e, 14-65g and 14-65j, while also amending §§ 14-65f, 14-65h and 14-65i—also clearly demonstrates the legislature's emphasis on consumer protection. Senator Steven C. Casey remarked: "This bill would give the customer when he goes into a repair shop a free

through 14-65k are remedial in nature, and we must, therefore, construe them broadly to accomplish their purpose and "liberally . . . in favor of those the legislature intended to benefit." *Small* v. *Going Forward, Inc.*, 281 Conn. 417, 424, 915 A.2d 298 (2007); id. (General Statutes § 14-62, which provides disclosure requirements for motor vehicle dealers, is remedial consumer protection statute).

Broadly interpreting the term "customer" under § 14-63 to include insurance companies, which are contractually obligated to pay for repairs made by licensees, better serves the purpose of the statute than narrowly construing the term not to include such companies. When an insurance company is obligated to pay for repairs to a vehicle under the terms of a policy, that company has a direct pecuniary interest in ensuring that a repairer licensee complies with its statutory obligations set forth in §§ 14-65f through 14-65j, as those provisions are aimed, in large part, at preventing unwarranted or hidden costs to licensees' customers. An insurance company, therefore, has an incentive to file a complaint under § 14-63 when it discovers a licensee's violation of §§ 14-65f through 14-65j. In contrast, the vehicle's actual owner has minimal incentive to file a complaint under § 14-63, because the insured is not paying for the cost of repairs made to the vehicle.[25] As a result, concluding that an insurance company is not

ability to know exactly what work is going to be done and how much he will be responsible for." 23 S. Proc., Pt. 5, 1980 Sess., p. 1338. One proposed amendment of Senate Bill No. 265, which was subsequently not enacted as part of Public Act 80-425, was the exclusion of collision or repair shops from the scope of the motor vehicle repair bill. Commenting on this amendment, Representative Eugene A. Migliaro stated: "[T]he main reason [repair shops should be included] is to make sure that the consumer is getting what he paid for . . . ." 23 H.R. Proc., Pt. 20, 1980 Sess., pp. 5800–5801.

[25] Indeed, the plaintiff's attorney conceded, during oral argument before this court, that an insured would have little incentive to file a complaint under § 14-63.

a customer under § 14-63 would lead to an absurd result, specifically, discouraging the filing of complaints by the entity that actually has the incentive to do so. That construction would thwart the purpose of the statutory scheme, namely, to promote licensees' compliance with the statutory provisions, and to protect customers from the unscrupulous business practices of licensees.

A broad interpretation of the term "customer" under § 14-63 is further buttressed by the fact that it is harmonious with various dictionary definitions of the term, which, as discussed previously in this opinion,[26] similarly define "customer" as one who purchases a service or commodity from another. An insurance company that furnishes payment for the repair of a vehicle by a licensee, pursuant to the terms of an insurance policy, is effectively purchasing a service from, and thereby becomes a customer of, the repairer licensee.

Moreover, we presume that the legislature was aware of the fact that licensees often conduct business dealings with insurance companies when repairing vehicles. "[I]t is now well settled that testimony before legislative committees may be considered in determining the particular problem or issue that the legislature sought to address by the legislation." (Internal quotation marks omitted.) *Hatt* v. *Burlington Coat Factory*, 263 Conn. 279, 314, 819 A.2d 260 (2003). While testifying before the joint standing general law committee concerning House Bill No. 8187, which led to the enactment of §§ 14-65f, 14-65h and 14-65i, George Emanuel, who represented the Service Councils of Connecticut and the Auto Body Association of Greater Hartford, testified: "We deal mostly with insurance companies as far as automobile body repairing." Conn. Joint Standing Committee Hearings, General Law, Pt. 3, 1975 Sess., p. 1256. On the basis of this testimony, it is reasonable to pre-

---

[26] See footnote 23 of this opinion.

sume that the legislature not only was aware of this fact, but also that insurance companies may, therefore, be subjected to the same unscrupulous practices as would the owner of a vehicle or any other customer of a repairer licensee.

Finally, although not entitled to any special deference in the present case, the past practice of the department also provides support for a broad construction of the term "customer" under § 14-63.[27] During the department hearing in the present matter, an attorney from the department's bureau of safety enforcement asserted that: (1) it is the department's position that insurance companies can be customers under § 14-63; (2) the department has previously allowed insurance companies to file complaints under § 14-63; (3) the department has previously heard matters filed by insurance companies; and (4) AMEX was permitted to file a complaint as a customer under § 14-63.

We are not persuaded by the plaintiff's arguments for why insurance companies generally, and AMEX specifically, do not constitute customers under § 14-63. First, there is nothing in the language of §§ 14-65f (a),

---

[27] The department's past practice and determination of who constitutes a customer under § 14-63 is not entitled to special deference because the interpretation of the term "customer" is a question of law for the courts. *Southern New England Telephone Co.* v. *Cashman*, supra, 283 Conn. 649. In addition, although its past practice indicates that the department has interpreted the term "customer" to include insurance companies, special deference is still not warranted because the proffered evidence fails to show that: (1) the department has *formally articulated* its interpretation of the term; and (2) the department has allowed insurance companies to file complaints under § 14-63 for an *extended period of time*. See *Longley* v. *State Employees Retirement Commission*, 284 Conn. 149, 164, 931 A.2d 890 (2007) ("an agency's interpretation of a statute is accorded deference when the agency's interpretation has been formally articulated and applied for an extended period of time, and that interpretation is reasonable"). We nevertheless find the department's practice and construction of the term to be reasonable and *persuasive support* for our conclusion that insurance companies may be customers for purposes of filing a complaint under § 14-63.

14-65g (a) and (e), and 14-65h (b) that expressly *prohibits* an insurance company from fulfilling the duties of a customer under those provisions, especially if so authorized by the company's insured. Had the legislature intended to limit the breadth of the term to vehicle owners, or to exclude insurance companies, it could have easily and expressly done so. See, e.g., *Windels* v. *Environmental Protection Commission*, 284 Conn. 268, 299, 933 A.2d 256 (2007). Further, the plaintiff's contention that an insurance company must be engaged in the "business of insurance" with a licensee in order to be a customer under § 14-63 is not supported by fact or law.[28] Finally, the plaintiff promulgates a three part test in its brief, based on the definition of "customer" in Black's Law Dictionary and the plaintiff's own notion of what constitutes "characteristics inherent in any customer," and it urges this court to utilize this test when determining whether one qualifies as a customer under § 14-63.[29] We are not persuaded and, accordingly, we decline to adopt the plaintiff's proffered test.

As we have explained, an insurance company's dealings with a licensee need not constitute the business of insurance in order for the company to be a customer

[28] The plaintiff claims that an insurance company must engage in the "business of insurance"—as contemplated by the United States Supreme Court in *Group Life & Health Ins. Co.* v. *Royal Drug Co.*, supra, 440 U.S. 205—in order to be a customer under § 14-63. In *Royal Drug Co.*, the sole issue was whether the actions of an insurance company constituted the " 'business of insurance,' " whereby the actions would be exempt from antitrust laws pursuant to § 2 (b) of the McCarran-Ferguson Act. Id., 207–10. We agree with the defendant in concluding that *Royal Drug Co.* is clearly inapposite to the present matter, and, therefore, provides neither binding nor persuasive authority for the proposition that an insurance company's business dealings with a repairer licensee must constitute the "business of insurance" in order to be a customer under § 14-63.

[29] Specifically, the plaintiff proposes that an insurance company should be considered a customer under § 14-63 only if: (1) its dealings with a licensee constitute the business of insurance; (2) it is able to choose a licensee to perform repair work on an insured's vehicle; and (3) it has privity of contract with its chosen licensee.

under § 14-63. Next, the plaintiff properly asserts that an insurance company is precluded, pursuant to General Statutes § 38a-354 (b),[30] from *requiring* an insured to use a specific repair shop. The plaintiff incorrectly claims, however, that an insurance company's ability to choose a licensee is a prerequisite to being a customer under § 14-63, because an insurance company *may* choose a licensee, under § 38a-354 (b), if the company first obtains the insured's express written consent. Finally, the plaintiff asserts that an insurance company must have privity of contract with a licensee in order to be a customer under § 14-63, while at the same time acknowledging in its brief that "the absence of privity as a defense in actions for damages in contract and tort actions is generally no longer viable . . . ."[31] A customer's statutory rights under § 14-63 are not, however, limited to filing complaints based solely on a licensee's breach of a particular provision in a repair contract. Put differently, a customer may file a complaint against a licensee for violating any statutory provision pertaining to the operations of or services provided by a licensee, regardless of whether such alleged violation constitutes a breach of an individual repair contract.

We conclude, therefore, that when an insurance company is obligated under the terms of an insurance policy to pay for the cost of a licensee's repairs to a vehicle, the company does not need to have privity of contract

---

[30] General Statutes § 38a-354 (b) provides: "No insurance company doing business in this state, or agent or adjuster for such company *shall require* any insured to use a specific person for the provision of automobile physical damage repairs, automobile glass replacement, glass repair service or glass products *unless otherwise agreed to in writing by the insured.*" (Emphasis added.)

[31] While the plaintiff correctly contends that the absence of privity as a defense in a tort action is generally no longer viable; see, e.g., *Coburn* v. *Lenox Homes, Inc.*, 186 Conn. 370, 375, 441 A.2d 620 (1982) (lack of privity not fatal to plaintiff's negligence recovery); we are unable to locate authority that allows an action for contract damages absent privity of contract between the parties.

with the licensee in order to be a customer under § 14-63.[32]

In the present matter, we conclude that AMEX was a customer under § 14-63 because AMEX was obligated to pay for the repairs to Speckmann's vehicle under the terms of an insurance policy. Accordingly, the trial court properly upheld the department's determination that AMEX was a customer under § 14-63.

II

The plaintiff next claims that the trial court improperly concluded that substantial evidence in the record supported the department hearing officer's determination that the plaintiff violated §§ 14-65g, 14-65i and 14-65j. Specifically, the plaintiff contends that the hearing officer's conclusions were clearly erroneous based on the evidence presented at the hearing. We address the plaintiff's claim with respect to each statutory violation in turn.

As a preliminary matter, we revisit the appropriate standard governing judicial review of an agency's decision. "[J]udicial review of the commissioner's action is governed by the [UAPA] and the scope of that review is very restricted. . . . [R]eview of an administrative agency decision requires a court to determine whether there is substantial evidence in the administrative record to support the agency's findings of basic fact and whether the conclusions drawn from those facts are reasonable. . . . Neither this court nor the trial court may retry the case or substitute its own judgment

---

[32] An insurance company is also considered to be a customer under § 14-63 if it owns a vehicle being repaired by a licensee, regardless of whether it: (1) owned the vehicle prior to the commencement of repairs; or (2) obtained title to the vehicle after a licensee had initiated repairs. Referring to General Statutes §§ 14-63 and 14-65e through 14-65k, the amicus curiae Auto Body Association of Connecticut concedes that "[o]nce an insurance company does take title, it too, can avail itself of the protections afforded by these statutes."

for that of the administrative agency on the weight of the evidence or questions of fact. . . . Our ultimate duty is to determine, in view of all of the evidence, whether the agency, in issuing its order, acted unreasonably, arbitrarily, illegally or in abuse of its discretion." (Internal quotation marks omitted.) *Sengchanthong* v. *Commissioner of Motor Vehicles*, supra, 281 Conn. 609.

"The substantial evidence rule governs judicial review of administrative fact-finding under the UAPA. [See] General Statutes § 4-183 (j) (5) and (6). An administrative finding is supported by substantial evidence if the record affords a substantial basis of fact from which the fact in issue can be reasonably inferred. . . . The substantial evidence rule imposes an important limitation on the power of the courts to overturn a decision of an administrative agency . . . . It is fundamental that a plaintiff has the burden of proving that the commissioner, on the facts before him, acted contrary to law and in abuse of his discretion . . . . The law is also well established that if the decision of the commissioner is reasonably supported by the evidence it must be sustained." (Citation omitted; internal quotation marks omitted.) *Murphy* v. *Commissioner of Motor Vehicles*, 254 Conn. 333, 343–44, 757 A.2d 561 (2000). "This substantial evidence standard is highly deferential and permits less judicial scrutiny than a clearly erroneous or weight of the evidence standard of review." (Internal quotation marks omitted.) *Connecticut Light & Power Co.* v. *Dept. of Public Utility Control*, 266 Conn. 108, 124, 830 A.2d 1121 (2003).

A

The plaintiff first contends that the department hearing officer improperly concluded that it violated § 14-65g, based on a determination that the plaintiff "charged for items that were not necessary or reasonable to repair the problems complained of, as contemplated

by the waiver of advance estimate." Specifically, the plaintiff argues that the terms "necessary" and "reasonable" in § 14-65g (a) are vague, and, therefore, that a licensee's charges are not limited to parts and labor related directly to the repair of the vehicle. The plaintiff further asserts that the hearing officer's interpretation of the terms "necessary" and "reasonable" was unwarranted, because they have never been subject to judicial or administrative scrutiny. Finally, the plaintiff claims that there is no provision in § 14-65g (a) that limits charges to parts and repairs on a vehicle.

In response, the defendant contends that a licensee is permitted to charge only for *repairs* that are reasonable and necessary after obtaining a waiver pursuant to § 14-65g (a). The defendant further claims that the decisions of the department hearing officer and the trial court were proper, as there was substantial evidence that the plaintiff had charged for various storage and administrative items that were not necessary to repair the vehicle. We agree with the defendant.

Section 14-65g (a) provides in relevant part: "A customer may waive his right to the estimate of the *costs of parts and labor* required by section 14-65f, only in writing in accordance with this section. Such a waiver shall include an authorization to perform reasonable and necessary *repairs* to remedy the problems complained of . . . ." (Emphasis added.) The plaintiff's vagueness claim lacks merit because the text of the statute is plain and unambiguous in providing that a licensee may charge only for reasonable and necessary *repairs* to the vehicle, thereby restricting charges to the parts and labor required to make such repairs.

The trial court concluded that substantial evidence supported the department's determination that the plaintiff violated § 14-65g (a), based on the plaintiff having charged for: (1) forty-three days of bay tie-up

charges after it had stopped working on the vehicle; and (2) various administrative and miscellaneous duties that did not involve actual repair to the vehicle, including, inter alia, charges for faxing documents, removing the license plate and personal belongings from the vehicle, and driving to the post office.[33] Since all of these charges did not involve repair to the vehicle, this evidence more than reasonably supported the department's determination that the plaintiff violated § 14-65g (a), and we, accordingly, conclude that the department's decision was supported by substantial evidence.

### B

The plaintiff next claims that the department improperly concluded that it had violated § 14-65i because "the evidence produced at the [department] [h]earing clearly demonstrates that the [p]laintiff maintains signs for every expense charged and has, at all times, complied with the requirements of . . . [§] 14-65i." Specifically, the plaintiff contends that a sign was posted outlining the conditions under which storage charges may be imposed, and that § 14-65i does not require a licensee to post criteria for when storage charges, as opposed to bay tie-up charges, will be imposed.

The trial court concluded that substantial evidence supported the department's determination that the

---

[33] The additional charges on the plaintiff's invoice included: (a) $3840 for bay tie-up, at a rate of $160 per day for 24 working days; (b) $741 for bay tie-up, at a rate of $39 per day for 19 nonworking days; (c) $20 for 1 day of outside storage; (d) $72 for outside fenced storage, at a rate of $24 per day for 3 days; (e) $68 for preparing an estimate; (f) $78 for writing a damage report; (g) $78 for preparing a supplement; (h) $68 for an appointment regarding the supplemental appraisal; (i) $66 for facsimile charges; (j) $2 for moving the vehicle outside for inspection; (k) a $125 administrative fee; (*l*) $19.13 for removing personal belongings from the vehicle; (m) $7.80 for removing the license plate; (n) $0.50 for a key tag; (o) a $10 photograph fee; (p) $40 for driving to the post office and preparing for a wrecker service; (q) $9.07 for certified mail; (r) $20 for rotating automobiles to allow access for the vehicle to be picked up; and (s) $15 for moving parts outside to be picked up.

plaintiff violated § 14-65i, based on: (1) the plaintiff not having posted "criteria for the imposition of bay tie-up charges as opposed to storage charges"; and (2) the plaintiff's owner having conceded, during the department hearing, that the plaintiff "does not have a consistent policy as to the imposition of bay tie-up charges." We agree.

Section 14-65i (b) provides in relevant part: "Each motor vehicle repair shop shall post a sign, as required by this subsection, in each area of its premises where work orders are placed by customers. The sign shall state: (1) The hourly charge for labor; (2) the *conditions*, if any, under which the shop may impose charges for storage, and the *amount* of any such charges . . . ." (Emphasis added.) The statute clearly provides that if a licensee imposes storage charges, it must also inform its customers of when, and in what amount, such charges will be imposed.

The plaintiff asserts that it did, in fact, satisfy the conditions requirement of § 14-65i by having the following sign posted: "STORAGE CHARGES: If Any Delays Beyond Our Control Or If Not Picked Up Within 48 Hrs. Of Completion."[34] The plaintiff further contends that this sign provides the conditions for the imposition of storage charges *and* bay tie-up charges. Both the department investigator's report and the department's decision, however, indicate that the plaintiff charged different rates for storage and bay tie-up. See footnote 12 of this opinion. As a result, while the plaintiff's sign may provide the conditions under which either storage or bay tie-up charges may be imposed, the sign does not inform customers of the conditions in which storage charges will be imposed *as opposed to* the more costly

[34] This sign was not mentioned, as the plaintiff claims in its brief, in the complaint investigation report prepared by the department investigator. The plaintiff's owner did mention the sign, however, during the department hearing.

bay tie-up charges, and vice versa. The sign, therefore, does not inform customers of a definitive amount they will be charged if the conditions do, in fact, come to fruition. Accordingly, we conclude that the trial court properly determined that there was substantial evidence to support the department's conclusion that the plaintiff violated § 14-65i.

## C

Finally, the plaintiff contends that the department improperly concluded that "it misstated in writing and charged more for bay tie-up charges than the amount posted on its sign on the premises" in violation of § 14-65j.

Section 14-65j (a) provides in relevant part: "No repair shop shall make any statement to a customer which it knows *or should know* to be false or misleading. . . ." (Emphasis added.)

The plaintiff specifically claims that it never made a false statement to Speckmann, since it posted a sign listing bay tie-up charges as $20 per hour, and, therefore, charged "$160 for bay tie-up charges per day, computed by multiplying eight hours (a typical workday) . . . ." In making this claim, however, the plaintiff failed to mention in its brief that the sign also listed bay tie-up charges as $120 per day, despite the plaintiff's owner admitting this fact while testifying at the department hearing.[35] The evidence on the record indicates, there-

[35] During the department hearing, the following exchange took place between the department hearing officer and the plaintiff's owner:

"Q. . . . The bay tie-up charge. This is a regular charge that you charge people?

"A. Yes.

"Q. So, it isn't just this case?

"A. No.

"Q. You charge this on a regular basis?

"A. Correct.

"Q. And you have a sign?

"A. I have t[w]o signs.

"Q. What is the amount o[n] the sign?

fore, that the plaintiff charged AMEX $160 per day for bay tie-up, despite the fact that the plaintiff's owner knew, or *should have known*, that it had a sign posted that listed bay tie-up charges as $20 per hour or $120 per day. Accordingly, we conclude that the trial court properly decided that substantial evidence supported the department's determination that the plaintiff violated § 14-65j.

The judgment is affirmed.

In this opinion the other justices concurred.

"A. Twenty dollars per hour or one hundred sixt[y] dollars per day.

"Q. What was the sign up at the time that this person was a customer? Or the time that the inspector went in?

"A. Well, that's where the confusion comes in.

"Q. What was the sign that was up at the time that the inspector went in?

"A. When the inspector came in it was one hundred twenty dollars per day, twenty dollars per hour. Those two signs.

"Q. Then why did you charge them one hundred sixty dollars?

"A. Because it was on the framing machine. It was twenty dollars per hour. I work ten hour days. It should have been two hundred dollars."